IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 5, 2016

**STATE OF TENNESSEE v. ANTHONY BAILEY**

**Appeal from the Criminal Court for Shelby County**
**No. 14-01434     Glenn Wright, Judge**

---

**No. W2015-00784-CCA-R3-CD  -  Filed March 29, 2016**

---

The defendant, Anthony Bailey, was convicted by a Shelby County Criminal Court jury of robbery, a Class C felony, and assault, a Class A misdemeanor. He was sentenced by the trial court as a Range I, standard offender to concurrent terms of five years in the workhouse for the robbery conviction and eleven months, twenty-nine days for the assault conviction. On appeal, he argues that the evidence is insufficient to sustain his robbery conviction, the trial court erred by denying his motion to suppress the victim's pretrial and in-court identifications, and the trial court erred by enhancing his sentence and by denying his request for probation. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Jennifer J. Mitchell, Memphis, Tennessee, for the appellant, Anthony Bailey.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Austin Scofield, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of the August 16, 2013 robbery of the victim, a maintenance worker at a Memphis apartment complex, who had just completed his workday when he was attacked, beaten, and robbed of his wallet, cell phone, car keys, and the Nissan Xterra he had been driving, which belonged to his brother-in-law. Later that night, the

victim, who had returned to the complex with his brother-in-law to look for the vehicle, identified the perpetrators after they were stopped by the police while driving in the Nissan near the apartment complex. The victim also later identified the male perpetrators at the police station by their individual mug shots. The Shelby County Grand Jury subsequently indicted the defendant and two co-defendants, Roosevelt Barnes and Trey Morgan, for the aggravated robbery of the victim.

## Motion to Suppress

Prior to trial, the defendant and his co-defendants filed motions to suppress the victim's pretrial and in-court identifications, arguing that the show-up identification procedure employed by the police at the crime scene was unduly suggestive and unreliable and that it tainted the subsequent police station identifications and any future in-court identifications. At the November 14, 2014 suppression hearing on Defendants Barnes and Morgan's motions,[1] Sergeant Marcus Frierson of the Memphis Police Department identified the statement he took through a translator from the Hispanic victim on the morning of August 17, 2013, in which the victim described the first man as having braids and dressed in a blue hat, long dark sweatshirt, and blue jeans, the second man as having braids and dressed in a white t-shirt and dark colored pants, and the third man as dressed in a white t-shirt and very baggy blue jeans. Sergeant Frierson testified that the victim identified all three men at the crime scene as the individuals who robbed him and stole his vehicle. He said that he showed the victim individual photographs of the men he had identified as he was taking the victim's statement and that the victim wrote down for him the role each individual played in the crime.

On cross-examination, Sergeant Frierson acknowledged that the victim also identified from individual photographs two women that were involved in the robbery. He said he took the victim's statement at 3:30 a.m. and did not know what time the victim identified the perpetrators at the crime scene. He reiterated that he did not show the victim the individual photographs of the defendants "for identification purposes," but only so that the victim could explain to him the role each man played in the crime. To his knowledge, the victim was never asked to identify the defendants from six-person photographic lineups.

---

[1]The transcript of the December 10, 2014 hearing on the motion to suppress filed by the defendant in the case at bar, Anthony Bailey, consists only of argument by counsel and the following explanatory notation: "A previous motion to suppress hearing was heard on November 14, 2014, on co-defendants Trey Morgan and Roosevelt Barnes. Anthony Bailey was not present, having forfeited his bond, a copy of said hearing provided to [Defendant Bailey's counsel], prior to this hearing." The defendant failed to include that November 14, 2014 transcript in his original appeal but later supplemented the record with the transcript of the earlier hearing.

Officer Robert Smith of the Memphis Police Department testified that he responded to the robbery call after other officers had stopped the stolen vehicle at the entrance to the Corner Park Apartments on Winchester. The victim was on the scene and, through his brother-in-law, identified the three men that officers removed from the vehicle as the ones who had robbed him. The victim was "quick with his response" and seemed certain of his identifications. On direct examination, Officer Smith recalled that when the victim was asked whether the two women who were removed from the vehicle were involved, he replied, "[N]o," at least with respect to one of the women. On later cross-examination, however, Officer Smith indicated that his memory on that point was not entirely clear and that the victim may have also identified both women as participants in the crime.

Officer Smith testified that he asked the victim to confirm his identity of Defendant Roosevelt Barnes, who had been placed in the backseat of Officer Smith's squad car, by rolling down the car window and asking the victim if he was certain Mr. Barnes was involved. He said the victim answered, "[Y]es."

On cross-examination, Officer Smith testified that he believed the victim reported that the robbery had taken place at "1400 or 1600 hours the day before" the victim's identifications of the defendants at the scene, which occurred "shortly after midnight." He said the victim was approximately twenty to twenty-five feet from the vehicle when the suspects were removed, and the area was well-lit by lights from the apartment complex as well as by street lights. In addition, the officers had their squad car lights shining on the suspects. The victim did not seem intoxicated.

On direct and cross-examination, the victim, Ramon Aquino, related the following account through an interpreter: At approximately 6:00 or 6:30 p.m. on August 16, 2013, he had just finished locking up his tools in his storage area at the Corner Park Apartments when a man who had his hand in his belt in a menacing manner approached him wanting money. The victim did not initially see a gun, but when the man lifted his shirt, he was able to see that he had a black pistol. The man pushed him, and he and the man began struggling. The first man was joined by a second man, and the two began beating the victim until the victim broke away and fled toward the street, with the first man in pursuit. When the victim reached the street, two other men approached and attacked him, dragging him from the street to "a more secure place" where all three men beat him. He got a good look at all of the men's faces as they were dragging him to the secluded location and during the hour-long attack. He also heard women's voices and felt either a man or a woman put his or her hands in his pocket during the attack. He did not see the women's faces, however.

3

The victim's cell phone and car keys were taken during the beating, which ultimately resulted in his losing consciousness. When he came to at approximately 10:30 p.m., he ran toward the street to search for help, found a police officer, and tried to tell him that he had been assaulted. The officer, however, asked him if he had been drinking or using drugs. The officer eventually took him home, where he called his brother-in-law, who came to his house and took him back to the complex to search for the vehicle. His brother-in-law called the police when they were unable to find the vehicle, and the victim was in the process of talking to the police on the scene when other officers stopped the vehicle at the complex and removed its occupants. The victim recognized the three men that the officers removed from the vehicle as the ones who attacked and robbed him, but he was not certain about the two women removed from the vehicle because he never saw their faces. He was unable to identify the women from six-person photographic spreadsheets later shown to him by the police. He did, however, identify them from individual photographs, despite his uncertainty about their involvement.

The victim testified that he saw the three men being handcuffed and placed in the backseat of squad cars and that he identified them while they were in the squad cars. He said he was certain that five people attacked him, but the only three that he was certain in his identification were the three men. Finally, he acknowledged that he had been sent home with a report of the robbery that included photographs of the defendants.

Defendant Roosevelt Barnes testified that after he and the other occupants were removed from the vehicle, they were each handcuffed and placed in the backseat of separate patrol cars. He said the victim was brought to each car in turn, and he pointed and nodded his head as he looked in each vehicle.

On January 8, 2015, the trial court entered a written order finding that the show-up identification procedure was "an on-the-scene investigatory procedure, instituted shortly after the offense occurred" and was not unduly suggestive. The trial court, therefore, denied the defendants' motions to suppress the show-up identification or any in-court identifications by the victim. The court, however, granted the defendants' motions to suppress the police station "single shot photographs" identifications by the victim, finding that the procedure was "unnecessarily suggestive" and that "no exigent circumstances existed."

## Trial

### State's Proof

The State's first witness at trial was the victim, whose testimony was again presented through an interpreter. The victim testified that in August 2013, he worked in

maintenance at the "Corner Apartments" at Winchester and Lamar in Memphis and on August 16 was occupied with repairs in a vacant apartment. Between 6:00 and 6:30 p.m. that evening, he had just finished locking up his tools in his storage area when he saw a man running toward him and then felt someone push him from behind. After falling forward, he turned around to be confronted by an African-American man who "grabbed something on his belt" as he demanded the victim's money. Instead of complying, he wrestled with the man until a second man hit him on the left side of his face. The victim testified that when he got back up, he saw that the first man was pointing a gun at him, so he fled toward an exit door with the first man in pursuit.

The victim testified that as soon as he exited the building, a third man hit him in the face, and he again fell to the ground. At that point, the first two men grabbed him by the legs and dragged him back toward the apartments to a secluded area, where all three men beat him. The victim said that in addition to those three men, he believed that there were at least two women present, testifying that he heard their voices and saw or felt one of them put her hand inside his pocket. The victim identified photographs of his injuries, which were admitted as exhibits and published to the jury. On direct and cross-examination, he testified that he believed he lost his trousers and his shoes when the men dragged him back toward the apartments. The victim stated that the perpetrators took his car keys and his cell phone. He later discovered that they had also taken his wallet, which he had kept in his vehicle.

The victim testified that he was rendered unconscious by the beating. When he regained consciousness, he was frightened and wanted to "leave that place to seek help." He, therefore, ran toward Winchester, dressed only in his underpants and shirt, and without stopping to look for his vehicle. When he saw a police officer who was writing a ticket to someone, he approached him and, although his English was only "okay" and the officer did not speak Spanish, he believed that he was able to make the officer understand that he had been robbed and beaten. The officer, however, shined a flashlight in his face and asked him if he had been drinking or using drugs. The victim testified that he told the officer that he did not drink or use drugs. He stated that the officer put him in his patrol vehicle, finished issuing his ticket to the person he had stopped, and gave him a sheet of paper and asked him to write down his address. The officer then took him home.

The victim testified that it was midnight when he reached home. He said he told his wife what had happened and she called his brother-in-law, the owner of the Nissan, who suggested that he and the victim return to the apartment complex for his vehicle. The victim explained that, at that point, he knew that the vehicle's keys had been taken but did not know that the vehicle itself was missing. He said that when they reached the complex and found that the vehicle was not there, his brother-in-law called the police to report it stolen. The victim testified that while he and his brother-in-law were standing

5

outside on Winchester waiting for the police, he saw the Nissan Xterra being pulled over by the police at the main gate to the complex, in an area that was well-lit. He said he was approximately twenty feet from the vehicle and recognized the three men that the police pulled from the vehicle as the men who had beaten and robbed him.

The victim testified that his car keys were in the vehicle but that his wallet and his children's booster seat and baby car seat were missing. His child's booster seat was returned to him the next day, but it was damaged, with the straps slashed. He never got his wallet back. The victim made positive courtroom identifications of the defendants as the men who robbed and beat him, testifying that Trey Morgan was the gunman who first confronted him and demanded his money, Roosevelt Barnes was the second man who hit him in the face as he was wrestling with Mr. Morgan, and Anthony Bailey was the third man who hit him in the face as he was trying to run away.

On cross-examination, the victim acknowledged there were inconsistencies between the statement he gave to police on the morning after the robbery and his trial testimony, including the work he had been doing before the attack, where he was when attacked, his description of the first attacker as having worn a blue hat, that four men and a woman were involved in the attack, and that he gave the first man $10 when he first confronted him and demanded money. The victim explained the inconsistencies in his translated statement to police by saying they were either mischaracterizations of what he told the police or the result of his confusion, trauma, and fatigue at the time he gave his statement.

The victim acknowledged he identified two women who were in the vehicle with the defendants that night as having been participants in the crime, but he was unable to later identify them from six-person photographic lineups he was shown by the police and might have assumed that they were participants by their presence in the vehicle. He further acknowledged that in a prior court proceeding, he identified Defendants Morgan and Bailey and a third man, Antonio Smith, as the perpetrators. He insisted, however, that his misidentification of Mr. Smith was merely a mistake, that he had obtained a good view of all three men during the hour-long attack, and that he was positive in his identifications of all three defendants.

On redirect examination, the victim reiterated that he was tired and in pain at the time he gave his statement to police. He testified that it was 3:00 a.m. and that he rushed to initial and sign the statement without really reviewing it because he just wanted to go home. He said he had a clear view of the defendants' faces during the attack but had identified the women primarily from their clothing, which was why he was unable to later identify them from the six-person photographic lineups he was shown. He further testified that he was not aware that Defendant Barnes was not in the courtroom at the

6

time he misidentified Mr. Smith as one of the perpetrators and that he was "confused" and "nervous" during that preliminary hearing.

The victim's brother-in-law, Joel Lara, testifying through the interpreter, corroborated the victim's account of how the victim's wife called Mr. Lara to report that the victim had been beaten and robbed, how Mr. Lara and the victim returned together to the apartment complex to look for his vehicle, and how they were standing outside after he had reported the vehicle stolen when they saw the police pull over the vehicle at the complex and remove three men and two women from it. He testified that they were twenty to thirty feet from the vehicle and were able to get a good look at the individuals that the police removed from the vehicle. He stated that the victim did not use drugs or alcohol and was not drunk. The victim seemed to be "in a lot of pain," but he also seemed certain in his identifications of the three defendants as the men who had beaten and robbed him. On cross-examination, Mr. Lara agreed that the area was not that well-lit and that five people could not have fit into his vehicle unless the children's car seats were first removed.

Officer Marlin Jones of the Memphis Police Department testified that about ten minutes after the description of the stolen vehicle was broadcast, he spotted it traveling through the intersection at Goodliest and Winchester, got behind it, and activated his lights and siren. The driver did not stop immediately but instead traveled another couple hundred feet to the apartment complex, where he pulled over and stopped. As he recalled, when he ordered the occupants out, three men and two women exited the vehicle, beginning with the driver. On cross-examination, he testified that, to his knowledge, no guns were found in the vehicle or on the occupants.

Officer Robert Smith of the Memphis Police Department testified that the victim became animated when officers removed the occupants of the vehicle, pointing at them and telling the officers through Mr. Lara, who was acting as the victim's interpreter, "that that was the people that did it." On cross-examination, Officer Smith acknowledged that the Corner Park Apartments were located in a high crime area in which drug crimes and prostitution were prevalent.

Sergeant Tim Murphy of the Memphis Police Department's Felony Response Unit identified a redacted version of a statement he had taken from Defendant Morgan, which was admitted as an exhibit and published to the jury. In the statement, Defendant Morgan related that his "[h]omeboy" had picked him up in the Nissan about twenty minutes before the vehicle was stopped by the police.

Sergeant Marcus Frierson of the Memphis Police Department's Felony Response Unit testified that Defendant Barnes refused to make a formal statement but did tell him

that he had removed from the Nissan a car seat and taken it to his home in order to make room for him to sit in the backseat of the vehicle. On cross-examination, he acknowledged that he never showed the victim any six-person photographic arrays of the defendants, explaining that the victim had already identified the defendants at the scene as the ones who had robbed him. Instead, he gave the victim individual photographs of the people that he had identified at the scene, and the victim "stated what those particular people did to him."

### Defendant Bailey's Proof

The defendant in the case at bar, Anthony Bailey, testified that on the afternoon of August 16, 2013, he was asleep in the home of the brother of his co-defendant, Trey Morgan, in the "Corner Stone" [sic] Apartments when he was awakened by the brothers' arguing. He said that after Co-defendant Morgan left the apartment walking, he called him to tell him that he was going to try to get a ride so that he could come pick him up. He then exited the apartment himself and went outside to look for anyone he knew who might be able to give him a ride. As he waited, he saw the victim, who was accompanied by a Caucasian woman, pull into the complex in a gray truck and park in the back parking lot. The victim and the woman got out of the truck, approached him, and asked if he had any crack cocaine. He told them he did not have any but could direct them to where they could get some if they were willing to provide him with a ride. He then took them to an apartment and waited nearby while they completed their drug transaction. When they were finished, the woman asked if he still needed a ride and whether he had anything. The defendant said he gave her $20 and the victim handed him the car keys, telling him that they would give him thirty minutes to an hour to take care of his business.

The defendant testified that he took the vehicle and drove down Winchester, where he spotted Co-defendant Morgan and picked him up. He then picked up his girlfriend, Kanisha Hubbard, and Mr. Morgan's girlfriend, "Kiana." Finally, at the request of the others, he drove to Codefendant Barnes's house to pick him up. Afterwards, the five of them went to Burger King to eat and to a service station to get gas before heading back to the apartment complex to return the victim's vehicle.

The defendant acknowledged that he kept the victim's vehicle for far longer than the agreed-upon time but denied that he stole the vehicle or robbed and beat the victim. He testified that the type of exchange he had engaged in with the victim was not an uncommon practice for the neighborhood.

Officer Robert Smith of the Memphis Police Department, recalled as a witness for the defendant, reiterated that the Corner Park Apartments were located in a high crime area with a lot of "drug crimes and thefts and robberies." He also agreed that the practice

of "pawning," or exchanging one object of value for another, was a fairly common occurrence in the criminal drug trade.

Following deliberations, the jury acquitted Roosevelt Barnes but convicted both the defendant and his co-defendant, Trey Morgan, of robbery and simple assault.

## Sentencing Hearing

The twenty-year-old defendant presented no proof at the sentencing hearing while the State relied on the presentence report, which showed that the defendant had prior convictions for criminal trespass and domestic violence. Defense counsel argued that the trial court should apply the mitigating factor that the defendant's criminal conduct neither caused nor threatened serious bodily injury. See Tenn. Code Ann. § 40-35-115(1) (2014). Defense counsel also argued that, in light of the defendant's youth and minimal criminal history, the trial court should sentence the defendant to three years on probation in order to facilitate the defendant's rehabilitation and transformation into a "productive citizen." At the conclusion of the hearing, the trial court found that the proposed mitigating factor was not applicable but that there were two applicable enhancing factors: the defendant's previous history of criminal convictions or criminal behavior in order to establish the necessary range and the fact that the defendant was a leader in the commission of the offense. See id. § 40-35-114(1), (2). The trial court considered, but rejected, the defendant's request for probation, finding, among other things, that the "facts and circumstances" of the case were "disturbing." The trial court, therefore, sentenced the defendant as a Range I, standard offender to five years in the county workhouse for the robbery conviction.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first challenges the sufficiency of the evidence in support of his robbery conviction. Specifically, he cites the "confused and conflicting testimony" the victim provided of the crime and the perpetrators to argue that the evidence was insufficient for a rational jury to find him guilty beyond a reasonable doubt. The State responds by arguing that the victim's clear account of the robbery and identification of the defendant, combined with the fact that the defendant returned to the scene later that night in the victim's stolen vehicle, supports the jury's verdict finding the defendant guilty of robbery. We agree with the State.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is

"whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

When viewed in the light most favorable to the State, the evidence at trial showed that the defendant and his accomplices attacked the victim as he was completing his work day, dragged him to a secluded spot, beat him, and robbed him of his wallet, cell phone, car keys, and vehicle. Later that night, the defendant was arrested by police after being spotted driving the stolen vehicle near the apartment complex. The victim unequivocally identified the defendant as a perpetrator while still at the crime scene and in the courtroom during trial. The jury heard the various inconsistencies in the victim's accounts of the crime, the defendant's testimony that the victim loaned him the use of the vehicle as part of a drug trade, and defense counsel's argument that the victim fabricated the assault and robbery in order to explain to his wife why he returned home late without his pants. By convicting the defendant of robbery, the jury obviously resolved discrepancies in favor of the victim's account and against that of the defendant, as was its

10

prerogative. We conclude, therefore, that the evidence is sufficient to sustain the defendant's robbery conviction.

## II. Denial of Motion to Suppress Victim's Identification of Defendant

The defendant next contends that the trial court erred by denying his motion to suppress the victim's pretrial and in-court identifications, arguing, as he did before the trial court, that the show-up identification procedure employed at the crime scene, followed by the individual photograph procedure employed at the police station, was inherently suggestive and tainted the victim's later in-court identifications. The State argues that the trial court properly denied the defendant's motion because the victim had ample opportunity to view the male suspects during the attack and his identification was made on the scene while the crime was still ongoing. We agree with the State.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Moreover, the party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. The application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Due process is violated if an identification procedure is: (1) unnecessarily or impermissibly suggestive and (2) gives rise to a "very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968). In Neil v. Biggers, 409 U.S. 188, 199 (1972), the United States Supreme Court established a two-part test to determine when a defendant's due process rights have been violated by a pretrial identification. Under this test, the court first considers whether the identification procedure itself was unduly or unnecessarily suggestive. Id. If the identification procedure is found to have been suggestive, the court next considers "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." Id. (internal quotations omitted); see also Stovall v. Denno, 388 U.S. 293, 302 (1967) (stating that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it").

11

The factors to be considered in evaluating the reliability of an identification obtained as part of a suggestive identification procedure include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. See Biggers, 409 U.S. at 199-200. The corrupting effect of the suggestive procedure is weighed against these factors. See Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

There is, however, no need for the court to apply the totality of the circumstances test outlined in Biggers if it first determines that the identification procedure itself was neither unnecessarily or impermissibly suggestive nor likely to create a substantial likelihood of irreparable misidentification. See State v. Biggs, 211 S.W.3d 744, 749 (Tenn. Crim. App. 2006) (citations omitted).

Show-up identification procedures have long been considered to be "inherently suggestive and unfair to the accused." State v. Thomas, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989). For this reason, Tennessee courts have repeatedly condemned the use of showups as a means of establishing the identity of an individual suspected of committing a crime, unless "(a) there are imperative circumstances which necessitate a showup, or (b) the showup occurs as an on-the-scene investigatory procedure shortly after the commission of the crime." Id. (citations omitted).

In the court's ruling denying in part and granting in part the defendant's motion to suppress the victim's identifications, the court found, among other things, that the show-up procedure was not unconstitutional because it was "an on-the scene investigatory procedure, instituted shortly after the offense occurred." The court, therefore, denied the motion to suppress the show-up identification. With respect to any in-court identification, the court, analyzing the Biggers factors, found that the victim had ample opportunity to view the suspects at the scene, gave the officers a prior description of the suspects, although not a very detailed one, appeared certain in his identification of the male suspects, and that the time between the crime and the confrontation was "not great." The court found to be "troubling" that photographs of the suspects were sent home with the victim but "notwithstanding this procedure," found that the identification was "somewhat reliable based on the totality of the circumstances." The court, therefore, also denied the motion to suppress the in-court identification.

We can find no error in the trial court's ruling. As the court noted, the victim was unequivocal in his identification of the male suspects, testifying repeatedly that he had ample opportunity to view their faces during the hour-long attack. Moreover, the show-up procedure, which occurred by happenstance when the suspects returned in the stolen

12

vehicle to the area where the victim was reporting the theft to the police, took place within a few hours of the crime and occurred in an area that was well-lit and close to the victim. We conclude, therefore, that the trial court properly denied the defendant's motion to suppress the pretrial and in-court identification.

## III. Sentencing

Lastly, the defendant contends that the trial court imposed an excessive sentence by misapplying enhancement factors and denying his request for probation. He argues that the trial court "never articulated" how it found the two enhancement factors and "gave no reason" for its denial of probation. The State argues that the trial court's sentence "was supported by the proof and was determined in accordance with the applicable sentencing procedures." Once again, we agree with the State.

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2012).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and the sentencing decision of the trial court will be upheld "so long as it is

within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." State v. Bise, 380 S.W.3d 682, 709-10 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6).

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. Id. § 40-35-303(a). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he is a suitable candidate for probation. Id. § 40-35-303(b); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527.

In determining if incarceration is appropriate in a given case, a trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). Furthermore, the defendant's potential for rehabilitation or lack thereof should be examined when determining whether an alternative sentence is appropriate. Id. § 40-35-103(5).

The trial court's ruling states in pertinent part:

Mitigating Factors 40-35-114, I've considered them all. I understand your argument, [defense counsel]. I'm going to decline to find it as a mitigating factor in this case. I've considered the Presentence Report, your social and mental history, physical history, the facts and circumstances of this case, which is disturbing to me. That people think they can just take something from somebody by force and violence. People have a right to live free without force and violence and people taking their property from them. I've considered the potential for rehabilitation and probation. I've considered society being protected from any possible or future criminal activity of the defendant. I've considered less restrictive means of confinement. I've considered the deterrent [e]ffect of this offense.

And I'm going to sentence Mr. Bailey to five years in the Shelby County Correctional Center, Standard Offender Range I. Application for probation is denied.

The record reflects that the trial court properly considered the relevant purposes and principles of the Sentencing Act, imposed a sentence within the applicable range for the defendant's Class C offense of robbery, and made the requisite findings in support of its ruling. Accordingly, we affirm the sentencing imposed by the trial court.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

15